Let's call the next case, which is 22-5019 Bond v. Wormuth, and I'm going to go with Mr.  Gamino. Gamino. Sorry. May it please the court, Daniel Gamino, my privilege to be here today on behalf of, on behalf of Crystal Bond, who is present with one of the co-counsel, Margaret Cook, in the back. I'm honored to speak on behalf of all the lawyers because there's not time for four and there's not room for four. Begin with a brief demonstration. Let the record show I'm raising up both of my hands so the court can see that my hands are empty. I have nothing in them. I can try to maybe distract you to not look at my empty hands, or I can come back tomorrow and make a claim that I had something in my hands. That's this case. That is this case in a nutshell. The employer had actual knowledge of a disability that Ms. Bond had contracted, PTSD. They had medical evidence from her counselor. Back away from the mic just a second. They had medical evidence from her counselor. They had medical evidence from the physician, Dr. Full. All of that was provided to the agency. The agency had full knowledge of that disability. The agency at that time has a duty under the ADA to initiate the interactive process. Well, did she exhaust her remedies or exhaust her claims? She did exhaust her remedies, and the claim is timely, beginning in... You say she did exhaust her administrative remedies? Please, sir. Did she exhaust her administrative remedies? She did exhaust her administrative remedies. She first, in the middle of having PTSD in March of 2018, made requests for FMLA. It's the only thing she knew to do. She did that, and it was provisionally granted, but she had to make four different applications because Mr. Hernandez only approved it for two weeks or for three weeks, come back. Ms. Bond and her counselor turned in four different requests for family medical leave. The employer had full knowledge, and all of those applications are in the appellate's appendix at tabs 4 through 12 to go through. Four times, making application. Four times, putting the employer on notice. Four times, putting that in the record. There was never, at that time, any kind of interactive process initiated by the employer, as required. The employer moved on, put her on AWOL, after that time expired for the Family Medical Leave Act, and still, she is left betwixt and between without any kind of relief. Finally, I'm not making this up, seven and a half months after March of 2018, when the first notice was given to the employer, October 19th, Mr. Hernandez, the supervisor, finally, at the end of a lengthy letter, and it's in the appellate's materials, appellate appendix, tab 19, is his providing the first time that anybody for the employer ever provides to her the form for a reasonable accommodation. They have a form. It's that commonly done. I don't know where the form was for seven and a half months. Well, are you suggesting that she doesn't have to exhaust her administrative remedies under the Rehabilitation Act, under Title VII, and with regard to the 2302 claims? That she can just keep asking for family medical leave, and that's all she needs to do? The issue is on exhausting her administrative remedies. The court is aware that there can be tolling of those times. Well, you're suggesting it's all tolled because of the failure to come up with interactive... The interactive process. The employer has the absolute duty to initiate that. The case law would fill this room. Both sides have to participate fully in the interactive process in good faith. And she went through giving them full notice, even when the agency finally gets around after seven and a half months, to say, oh, here's the form. You may want to fill this out. She did fill it out, and she did send it in. Counsel, on the exhaustion question, how did she comply with the 45-day rule in terms of contacting the EEOC? So, we move ahead then. After she turned in her request for reasonable accommodation in October 2018, there was no interactive process. The agency sat through November, December, into January. At the end of January 2019, they discharged her. They gave her notice of proposed removal in January of 2019. No response on a reasonable accommodation. Then she was discharged in March of 2019. Still hadn't had any kind of reasonable interactive process to try to address what there was medical evidence in the record. Well, maybe we can just kind of cut to the chase here. Is it correct that her first contact with the EEOC was December 12, 2019? Yes, it is correct, and that is verified by the EEOC. And the reason it's that date is, from March of 2019, she was trying to get her medical insurance established. Didn't she have to make that contact within 45 days of the last alleged act of discrimination? Right, she did. She is sitting there from March. What was the last act of discrimination that we're looking at to start the clock? Last act of discrimination was November 7, 2019. It's in the appellate's appendix, tab 28. It's when she is again asking Dwayne Braxton, where is my insurance? It hasn't been started. But that's an email that she sent to Mr. Braxton, correct? Yes. How can that be an act of discrimination by Mr. Braxton or the agency? I mean, it's her act. She sent the email. I don't see how you can rely on that email on November 7 when it's the plaintiff's conduct. Maybe you've got some authority for that, but if that's what you're relying on, then I'm not sure you've got 45 days. Well, what we rely on, in a nutshell, and the best indication of what we rely on, is a case that we cited in our brief at the bottom of page 13. It's where it starts, called Kowitz v. Trinity Health. And if I can read just a sentence of that and from that case. In this case, plaintiff's written notification that she would be unable to complete the basic life support certification without medical clearance, and her statement that she required four months of medical therapy before completing the certification, could have readily be understood to constitute a request for reasonable accommodation. Consequently, there remains a genuine issue of material fact, whether the plaintiff made a request for an accommodation sufficient to trigger the interactive process. That's the support that shows the agency had the obligation to go ahead and to provide the interactive process, and she is still working in October and November of 2019, trying to get from the agency her medical insurance, so she can be treated for PTSD. So, November 7th was her last time that she sent an email to Duane Braxton, please send my records on, please handle this case. Finally, she threw up her hands on December 12th, 2019, within 35 days, and began that process under the EEO. And I don't know, when you look at the case, I don't know whether to laugh or cry about everything that she went through, and the denial and the failure to act of the agency on her behalf, to grant her the interactive process that is required. I would request to reserve the remainder of my time. Thank you. You may. Good morning, Your Honors. My name is Nolan Fields, and I'm an Assistant U.S. Attorney. I'm representing the Secretary of the Army, Ms. Wormuth, on behalf of the Corps of Engineers. To start out, this is a really simple case, and the United States wins for three reasons, and you should affirm the District Court's decision. One, Bond failed to exhaust her administrative remedies across any of the potential claims that they float, or even minimally allege. Two, looking at the merits of the claims specifically, under the Rehab Act, Title VII, and prohibited personnel practices, she can't even meet the elements of the claims in their own right. And three, even if you go to the equity argument, effectively, that Mrs. Bond's counsel is making, that she didn't get a chance to participate in the interactive process, that's just patently false, based on the record in front of you. And if you look to the record, there's seven months of interactive process, but they're trying to be very technical and claim that providing a form somehow late in the game is the hard line, but that's not what the case law tells you. Describe in more detail what the interactive process was in this case. Sure. So it's basically a timeline in 2018, starting in March, when she requests FMLA, when she admits that she's had some serious conditions. She's seeing a counselor and other medical professionals, and she's not going to be able to fulfill her duties at that time. So her FMLA portion of that time that she gets that relief is basically from March through the end of May of 2018. Are you calling that part of the interactive process? Well, if you want to look at the interactive process, the case law basically states it's communications between an employer and an employee about what conditions they're experiencing, getting support from their medical providers, and then having the employer, if the individual can meet the essential functions of her job, then look to any reasonable accommodations. So after the FMLA period ends in May of 2018, there's additional communications. Throughout this period, there's telephone calls, emails, letters that are sent in the mail, back and forth between Mr. Hernandez, the HR representatives for the Corps, and Ms. Bond. There's so much communication. It's very clear that, repeatedly, Mr. Hernandez is looking for any type of medical updates throughout the summer. Are you calling this part of the interactive process? Absolutely. He's asking for medical information so he can, him and the Corps, can make a determination as to what, if she can fulfill the essential functions of her job. Because only then, under the law, can they potentially craft a reasonable accommodation. But what's interesting is that equity argument on behalf of Ms. Bond is really moot. Because when you look at her medical provider, starting in April of 2018, all the way through... Before you get there, was an accommodation ever requested by her or offered by your client? Arguably, she floated an idea of licking envelopes. But that was really in response to her supervisor, in October of 2018, saying, you provided... That's a little bit of hyperbole. What was the request of acquisition? Okay. She had requested telework, allegedly, in May and June of 2018. And Mr. Hernandez responded within the same months, explaining that it wasn't allowed under the policy. Because this is a very hypertechnical type of job, geographical information systems requiring a lot of computer activity, the policy of that group was everyone had to be in. And she even admits in her own... By her own admission, in November 1st of 2018, that when she realized later in the summer that that policy applied to everyone, she stopped asking because she knew it wasn't an available accommodation. But looking to November of 2018, she effectively... Her medical provider states in November 1st of 2018 with medical evidence that she would have never been able to do the job remotely anyway. Her conditions were so bad that that couldn't have been a reasonable accommodation. And then backdating that all the way back to April of 2018, her conditions only got worse through the summer. Did you offer her an accommodation as your position? There was no possible reasonable accommodation? There wasn't a possible one for them to offer. They didn't offer her a reasonable accommodation. And her medical provider, for six months, effectively explains that her condition only worsened so she wouldn't have been able to accomplish the essential functions of her job. Even if arguendo, there could have been an accommodation. She was never going to be able to fulfill the functions of her job. Well, if her medical provider communicated that, was there even an obligation to engage in an interactive process? Well, I believe that they were. Well, no, I understand your argument that there was a lot of interaction. But in terms of what the law requires to trigger that obligation, was there enough even to trigger it? I believe that, semantics aside, the extensive communications from multiple people at the core, supervisor, HR, the Army Benefit Center, all were working with Ms. Bond throughout those six months during her FMLA time, even after it. And they were looking for, under the law, what was required for the interactive process to determine whether or not a reasonable accommodation could be made. And that was, can you fulfill the essential functions of your job? And you don't just take the person at their own word. You take the advice of medical professionals like her counselor, her doctor, her PCP, etc. And you'll see from the correspondence that Mr. Hernandez repeatedly was just saying, has there been any improvement in your prognosis? Do you have any updated timeline on when you could potentially come back to work? Do you have any update that your symptoms are getting better or worse? He was asking for the precise information that the interactive process calls for, and there was a huge lull between when she goes on FMLA, and I think that's easily explainable because that's the same time in June of 2018 when she pursues three other avenues of recovery. She applies for Social Security, she applies for disability retirement, which she has to certify that she's not able to do the functions of her job, and she seeks workers' compensation. So in the summer, while she's not responding to any of Mr. Hernandez's requests for additional medical information, so he could potentially trigger to determine what reasonable accommodation could be made, she's effectively certifying to other federal agencies that she's never going to be able to come back, and she wants to recover. So when she finally gets back to Mr. Hernandez and provides the responses to the reasonable accommodation form, her own doctor states in the November 1, 2018 letter, I cannot see or identify any accommodations that could be made to Crystal in her current job position that could allow her to complete the mental tasks needed for the job. At this time, my opinion is that she would not be able to make or commute, or utilize any complex thinking skills needed to perform her job duties in this description, and that's in the record at 216 and 217 of the Appellee's Supplemental Appendix. What was the response to what she wrote on the reasonable accommodation form? The words, I don't know what my options are. Is there a response to that? Well, the response is, they can only potentially give her some valid, credible options that are reasonable if they have the medical information they've been seeking for six months. So there, on November 1, 2018, when she says, I don't know what my options are, of course she doesn't, because they haven't been given the information to actually make that determination. So it takes them two months, effectively, to make the determination that, unfortunately, based on her certifications to other federal agencies, that she's never going to be able to fulfill the duties of her job. They send her, unfortunately, the notice of potential removal in January 31, 2019. And ironically, her response to that is, you know what, you're right. The best thing for you, the court, is to just remove me so you can fulfill the position, and in turn, the best thing for me is to give me disability retirement so I can move on. She admits that, and she gets what she wants. She gets, like a week after her removal, she effectively gets disability retirement. She gets Social Security a few months later, in November of 19, and she also gets workers' comp. So she gets those other three avenues of recovery, and she actually thanks the Corps of Engineers in their interactions in November and December of 19, when they're attempting to reinstate her medical benefits, even though, arguably, it was really OPM who may have had some problems with the paperwork. She's telling them, thank you so much for your work. There's lots of cordial responses back and forth throughout the whole interactive process, even in the year after her termination. It's only in December of 19, when she's about a week out from getting her medical benefits reinstated, does she have her cake and want to eat it too, where she starts kind of thinking that she may have an employment discrimination claim. But in this case, she wasn't somehow left out in the cold. She had all the other legal remedies that are allowed to her by Social Security, by OPM for the disability, and by the workers' comp. But turning back, not from the interactive process, but looking to the arguments, Mr. Gamino, I believe, is wrong in that his analysis of, did she exhaust her claims? She did not. And the district court was very accurate in its opinion, and it kind of goes claim by claim and disavows the illusion that she may have had any claim that potentially was exhausted. When it comes to telework, if she arguably requested it orally by telephone in May and June of 2018, well, it's a year and a half before she gets in contact with the EEO in December of 19. So telework is not exhausted. When it comes to reinstatement of her medical benefits, the court's exactly right in its question. Judge Kelly, you asked, or Judge Matheson, could you trigger a continuing violation theory by allowing a potential employee who is allegedly being discriminated against to continue to email her former employer as a means of prolonging her ability or window to seek a claim? And the case law is, I think, pretty clear to counteract what Mr. Gamino was arguing. He floated that case, Coetts v. Trinity Health, and unfortunately, that's events triggering an interactive process when an employee is still employed. The time period in which he was applying that case for was only towards the medical benefits, and that's getting them reinstated after she's already been separated. Because she was separated in March 15th of 2019, but she doesn't really start emailing, even initiating the emails with the court until September of 2019. So right there, there's already six months that she failed to exhaust that claim. So again, by her sending an email as late as November 7th, 2019, that's not somehow a ways of extending a tolling period. Because if that was the case, FTCA, people seeking that recovery, would be emailing the government all the time trying to expand their statute of limitations or for other claims such as these, you would have the system just collapse upon itself. But anyway, the case that I think combats that is Troup, and it's at page 16 of the answer brief. And in addition to Troup, that basically the discriminatory facts can't be from an employee against themselves. But at the end of the day, when it comes down to it, just look at the record, look at the briefing. Mrs. Bond's counsel did not raise the arguments. They didn't provide any evidence or theory that could be applicable for somehow counting a former employee's emails to her former employee as a means of extending the tolling of violation or tolling the 45-day window for discrimination. Well, if counsel doesn't, or judges don't have any other questions, I reserve the rest of my time. Thank you. Counsel, appreciate it. And Mr. Gavino, you had some rebuttal? May it please the court, just two observations on what was said. I showed you my empty hands, and counsel on the other side has just proved what I was talking about. Counsel is working hard, zealously like he should, but all he has to work with is a sentence fragment out of one letter and a sentence fragment from another letter and a sentence fragment from over here and something from two months earlier. That is not a substitute for the interactive process, and whether the interactive process has been done. Mr. Gavino, what is your position that your client could have done that she was not given the option to do? She said she couldn't do anything, that she had PTSD and she just couldn't concentrate, just couldn't do anything. Good question. Good question. At a point in time, that may have been true, but anybody knows PTSD, judicial, take judicial notice, the condition can change, the condition can improve, as you start to do something and achieve success, as you start to improve, as you can start to do part of your job, as you start to do familiar things. Over and over again, she said she couldn't do this, that, or the other thing. In fragments of time, what they never gave her the chance to do. Well, what could they have done, put her on the job and just said, now do whatever you can do? She had been teleworking for two or three years before she ever was deployed, and telework was one thing that could have been tried. She said she couldn't do that. She said she couldn't concentrate. At one point in time, yes. But over the long haul of PTSD, they could start with an accommodation. She could have gone to an office that is more near her home, Fort Gibson, less of a commute. She could have done that. She could have started doing some work and worked her way out of PTSD. Instead, they just used a sentence fragment that you quoted, and all of this, respectfully, is a question of fact, whether there was an interactive process and where she was in it. We're here on motion for summary judgment. That's the error. There was never a trial on that question of fact. And counsel concluding that she can't do telework and concluding this, that, and the other is not a substitute for a trial. Motion for summary judgment. What is the basis for your argument on tolling? What tolling? Her mental condition? Yes. Tolling is a question of fact, again, that needs to be addressed in court with testimony, not a matter of summary judgment. And in closing, I would bring to the court's attention, and this is a case from the U.S. Supreme Court that I just became aware of last week, and there's no time to put it into the materials. The style of the case is Babb, B-A-B-B, versus Wilkie, W-I-L-K-I-E, 140 Supreme Court 1168, 2020 decision, 140 Supreme Court 1168, that held, that said, the federal government is held to a higher standard than a private employer, higher standard than state government, higher standard than local government. In this case, the federal government employer failed in their duties to this employee, and I think when you look at it through that lens, it's even more exaggerated and exacerbated than they failed in their duty. Thank you very much. Thank you, counsel. Counselor, excused. We appreciate the arguments in the cases submitted.